MINPECO, S.A., Plaintiff,

v.

**CONTICOMMODITY SERVICES, INC.,** Conticapital Management, Inc., Conticapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., ACLI International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache Halsey Stuart Shields, Inc., E.F. Hutton & Company, Inc., Commodity Exchange Inc., the Board of Trade of the City of Chicago, Continental Company, and Walter Goldschmidt, Defendants.

No. 81 Civ. 7619 (MEL).

United States District Court,
S.D. New York.

Dec. 22, 1987.

Cole & Corette, Washington, D.C. for plaintiff Minpeco, S.A.; Mark A. Cymrot, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, Gardere & Wynn, Dallas, Tex., for defendants Nelson Bunker, William Herbert and Lamar Hunt; Robert E. Wolin, Dallas, Tex., Aaron Rubinstein, Fred A. Freund, Robert B. Bernstein, Stanley D. Robinson, New York City, of counsel.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, for defendant Mahmoud Fustok; Herbert Stoller, Turner P. Smith, of counsel.

Rogers & Wells, New York City, for defendants ACLI Intern. Commodity Services, Inc., and Merrill Lynch, Pierce, Fenner & Smith Inc.; William R. Glendon, of counsel.

Debevoise & Plimpton, New York City, for defendant ACLI Intern. Commodity Services, Inc.; Andrew C. Hartzell, Jr., of counsel.

Sullivan & Cromwell, New York City, for defendants Prudential–Bache Securities, Inc. and Bache Group Inc.; Richard H. Klapper, of counsel.

Finley Kumble, Wagner Heine, Underberg, Manley Myerson & Casey, Washington, D.C., for defendant Intern. Metals Inv. Co., Ltd.

LASKER, District Judge.

Various defendants [1] move for summary judgment on all of plaintiff Minpeco's damage claims on the ground that Minpeco has failed to prove actual damages because its damage calculations do not take into account the extent to which Minpeco benefitted from defendants' allegedly manipulative behavior. The motion is granted in part and otherwise denied.[2]

1. Moving defendants are Nelson Bunker Hunt; William Herbert Hunt; Lamar Hunt; Merrill Lynch, Pierce, Fenner & Smith; ACLI International Commodity Services, Inc.; Bache Halsey Stuart Shields, Inc.; Mahmoud Fustok; International Metals Investment Co., Ltd. and Commodity Exchange, Inc.

2. Defendants' motion is based, *arguendo*, on the assumption that "the defendants did manipulate the silver market and that, but for such conduct, the price of silver would not have risen above $8–$10 per ounce, the highest price that would have prevailed in the absence of a manipulation, according to Minpeco's economics expert." Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Minpeco's Damage Claims at 3 n. 3 (August 3, 1987). This decision adopts this assumption for the purposes of this motion alone.

3. Familiarity with the facts and issues in this case is assumed.

## Minpeco's Damage Claims [3]

On its manipulation claims, Minpeco seeks to recover both its alleged actual or "out-of-pocket" damages and its alleged "lost profits" in the total amount of $225–$252 million.[4] Minpeco alleges that it lost approximately $107.7 million in so-called actual or "out-of-pocket" damages on short futures positions opened prior to November 30, 1979 and subsequently closed at a loss. Minpeco also alleges that it is entitled to its "lost profits" from these short positions in the amount of $100.2–126.4 million, representing "the gains [to Minpeco] which it is claimed would have occurred if the market had acted in a normal unmanipulated manner in December 1979." [5] Similarly, on long positions allegedly unhedged on the advice of Minpeco's brokers and on which hedges were subsequently reestablished at a loss, Minpeco claims an additional $17.2–18.5 million in damages, representing the difference between Minpeco's actual losses on these transactions and the gains which would have occurred but for the manipulation.[6]

In addition to these manipulation damages, Minpeco claims out-of-pocket losses of $49 million on its breach of fiduciary duty claim against Merrill Lynch: $38 million on short trades and $11 million on unhedged long trades.

The following example illustrates generally Minpeco's damage theory. Assume

4. The figures discussed here are drawn from the "Report on the procedures performed related to the silver futures trading in the matter of MINPECO, S.A. v. CONTICOMMODITY SERVICES, INC. ET AL.," prepared by the accounting firm of Grant Thornton ("Grant Thornton Damage Report") (March 31, 1987), Plaintiff's Exhibit ("PX") 2.

5. Minpeco's Memorandum in Opposition to Defendants' Motion for Summary Judgment On the Damage Claims at 10 (September 8, 1987) ("Minpeco Memorandum").

6. On September 2, 1987, Minpeco issued a supplement to its damage calculations which reduced its damage claims by approximately $6.7 million as a result of the identification of certain trades on which Minpeco did not bear the risk. *See* PX 3 (Supplement to Grant Thornton Damage Report).

that a jury concluded that 1) Minpeco sold silver futures short at $18 per ounce in November 1979; 2) Minpeco closed its short positions at $25 per ounce in January 1980; 3) the unmanipulated price of per ounce silver in November 1979 would have been $10; and 4) the unmanipulated price per ounce of silver in January 1980 would have been $8. Under Minpeco's damage theory, Minpeco would then be entitled to recover from these transactions 1) out-of-pocket losses in the amount of $7 per ounce, representing the difference between the actual manipulated price at which the positions were opened ($18) and the actual manipulated price at which the positions were closed ($25); and 2) lost profits in the amount of $10 per ounce, representing the difference between the actual manipulated price at which the positions were opened ($18) and the price at which the positions could have been closed on an unmanipulated market ($8).[7]

## Discussion

### I. *Out-of-Pocket Losses*

Defendants take the position that as a matter of law any damages which Minpeco suffered on the silver futures market as a result of the alleged manipulation were completely offset by profits gained on Minpeco's physical silver positions. At the core of this argument are two important undisputed facts. First, Minpeco has admitted that all of its silver futures trades from October to December 1979 were "hedges"[8] backed by physical silver.[9] Second, it is undisputed that Minpeco's damage calculations do not take into account any profit that Minpeco may have made as a result of its physical silver.[10]

Based on these facts, defendants contend that Minpeco's damage calculations do not

represent Minpeco's net economic loss because whatever losses Minpeco incurred on its futures positions when the price of silver increased were offset by the simultaneous increase in value of Minpeco's physical silver. In other words, using the numerical example posited earlier, defendants argue that the $7 per ounce loss which Minpeco incurred by opening short positions at $18 and closing them at $25 was completely offset by the corresponding $7 per ounce increase in the value of the physical silver owned by Minpeco which the short positions were intended to hedge. Finally, defendants argue that this flaw in Minpeco's damage calculations is irreparable because Minpeco lacks the documentation necessary to establish the size of the appropriate offset.

### a) *Legal Issues*

Defendants' "offset" argument has considerable force. Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall. This principle has been applied both in securities actions, *see, e.g., Abrahamson v. Fleschner,* 568 F.2d 862, 878 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978) (securities fraud plaintiff may not recover for losses, while ignoring his profits, "where both result from a *single* wrong") (emphasis in original); *Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1313–14 (2d Cir.1977) (securities fraud losses must be offset by corresponding gains since "the transaction cannot be fractionated"), and antitrust actions, *see Los Angeles Memorial Coliseum Commission v. NFL,* 791 F.2d 1356, 1366–67 (9th Cir.1986), *cert.*

---

7. This example is illustrated by the graph at Appendix A of this decision.

8. In a "hedge" transaction, as the term itself implies, a trader with an interest in the cash market for a commodity deals in futures contracts as a means of transferring risks he faces in the cash market. *See Leist v. Simplot,* 638 F.2d 283, 287 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 185 (1982). There is, however, "no bright line dif-

ference between hedgers and speculators," whose interests and activities frequently overlap. *Id.* at 288.

9. *See* Affidavit of Aaron Rubenstein in Support of Motion for Summary Judgment, Exhibit ("DX") 9 (interrogatories and responses Nos. 27 and 28).

10. *See* DX 12 (deposition of Mary Jane Morrow at 262–63).

*denied,* — U.S. ——, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987); *Kypta v. McDonald's Corp.,* 671 F.2d 1282, 1285–86 (11th Cir.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982); *cf. Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 671–72 n. 25 (D.C.Cir.1977).

The rationale of these cases is perhaps best articulated in *Los Angeles Memorial Coliseum,* an antitrust action involving the Raiders football team's move from Oakland to Los Angeles. There, the Ninth Circuit held that the district court erred in limiting the National Football League's damage offset defense by excluding from the jury's consideration in calculating damages the benefits which the Raiders incurred as a result of the NFL's anticompetitive behavior. The court based its decision in part on what it described as a

> non-fault based offset theory [which] is simply a corollary of the general principle, applicable outside the antitrust context, that an award of damages should put a plaintiff forward into the position it would have been "but for" the defendant's violation of the law.... Under this theory, the ultimate relief awarded must take into account any benefits which would not have been received by plaintiff "but for" the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation. An antitrust plaintiff may recover only to the "net" extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.

*Los Angeles Memorial,* 791 F.2d at 1367. Under this offset theory, Minpeco would be entitled only to its "net" economic injury and would be required to subtract from its gross damages on the futures market any benefits which accrued to it on its physical silver holdings.

Minpeco responds that its damages should not be subject to an offset under the rationale of the Supreme Court's decision in *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). In *Loftsgaarden* a group of investors in a tax shelter real estate scheme brought a securities fraud action seeking rescissionary damages from the general partner. The Court of Appeals for the Eighth Circuit held that under an "actual damages principle," an award of rescissionary damages must be " 'reduced by any value received as a result of the fraudulent transaction,' " *Austin v. Loftsgaarden,* 675 F.2d 168, 181 (8th Cir.1982) (quoting *Garnatz v. Stifel, Nicolaus & Co.,* 559 F.2d 1357, 1360 (8th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978)), *rev'd, Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), and held that the district court had erred in refusing to reduce plaintiff's damage award by an amount equal to any tax benefits they received as a result of the investment.

The Supreme Court reversed. Stating that "this Court has never interpreted [the 'actual damages' limitation of § 28(a) of the 1934 Act] as imposing a rigid requirement that every recovery ... under the 1934 Act must be limited to the net economic harm suffered by the plaintiff," 106 S.Ct. at 3153, the Court explained that where appropriate to avoid unjust enrichment, § 28(a) has been interpreted to allow a plaintiff to recover the measure of the defendant's profits rather the plaintiff's loss:

> Thus, the mere fact that the receipt of tax benefits, plus a full recovery under a rescissionary measure of damages, may place a § 10(b) plaintiff in a better position than he would have been in absent the fraud, does not establish that the flexible limits of § 28(a) have been exceeded.

*Id.* The Court also justified its holding by explaining that:

> Congress' aim in enacting the 1934 Act was not confined solely to compensating defrauded investors. Congress intended to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions. This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss." The effect of

allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors. The resulting diminution in the incentives for tax shelter promoters to comply with the federal securities laws would seriously impair the deterrent value of private rights of action, which, we have emphasized, "provide 'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to Commission action.' "

*Id.* at 3154 (citations omitted).

Although defendants argue that *Loftsgaarden* "is a narrow holding limited to whether *tax* benefits—as distinguished from the receipt of income—should be offset against losses in a suit for rescissionary damages under the securities laws," [11] the extensive language quoted above does not appear to be so limited. *Loftsgaarden* may be fairly read as supporting the proposition that there is no rigid requirement that a plaintiff must always be limited to its net economic injury where such a limitation would be inequitable or contrary to deterrent goals. However, Minpeco has made no showing that if an offset is imposed here defendants will be either unjustly enriched or sheltered from any "appreciable liability" as in *Loftsgaarden*. Indeed, as discussed below, Minpeco itself argues that its damages—even if limited to net economic injury—will still be significant if it proves its case at trial. In addition, any

damages awarded to Minpeco may, of course, be subject to trebling.[12]

■ I conclude that Minpeco's claimed damages on its silver futures positions must be offset by the measure of the increase in value which accrued to its own physical silver holdings—but not, as discussed below, those of its clients—as a result of defendants' allegedly manipulative behavior.[13] It is Minpeco's burden to establish the size of the appropriate offset. Although the *Los Angeles Memorial Coliseum* court refers to a "damage offset defense," 791 F.2d at 1366, the accepted rule is that the plaintiff, because it bears the burden of proving its claim for damages, also bears the burden of proof with regard to the offset. *See Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116–17 (3d Cir.) (directed verdict for antitrust defendant where plaintiffs failed to produce "the relevant cost figures essential to establish net profit" and thus "did not meet their burden of establishing the quantum of damages"), *cert. denied,* 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973); *Filmline (Cross–Country) Productions, Inc. v. United Artists Corp.*, 662 F.Supp. 798, 813 (S.D.N.Y.1987) (plaintiff required to prove offsetting costs saved by reason of defendant's wrongful conduct).

As discussed below, however, the conclusion that Minpeco's damage calculations must take into account the appropriate offset does not allow summary judgment on

---

**11.** Reply Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Minpeco's Damage Claims at 2 (Sept. 30, 1987).

**12.** Minpeco also argues that because defendants' manipulation created the high silver prices which induced it to enter the silver futures market, it is entitled to its gross out-of-pocket damages under *Chasins v. Smith Barney & Co.,* 438 F.2d 1167, 1173 (2d Cir.1970) and *Clark v. John Lamula Investors Inc.,* 583 F.2d 594 (2d Cir.1978). These decisions, however, stand only for the proposition that plaintiffs who establish that they were fraudulently induced to buy securities are not limited in damages to the difference between the purchase price and the fair market value of the securities on the date of purchase, but are entitled to be made whole by recovering the difference between the purchase price and the price at which they eventually

resell the securities. *See Chasins,* 438 F.2d at 1173; *Clark,* 583 F.2d at 604. While *Chasins* and *Clark* teach that defendants "cannot be heard to complain when making [plaintiff] whole requires them to pay out more than they received from their dealings with [plaintiff]," *Clark,* 583 F.2d at 604, they provide no support for Minpeco's claim that in calculating its damages it is entitled both to be made whole for the losses and to retain the profits resulting from defendants' activities.

**13.** While I conclude that Minpeco's damage calculations must account for the profits as well as the losses which it experienced as a result of defendants' manipulative behavior, it is premature without full briefing by the parties to determine the exact contours of the appropriate offsets which must be applied to Minpeco's various out-of-pocket damage claims.

Minpeco's "out-of-pocket" damage claims, because there remain numerous factual questions relating to such damage claims which must be resolved at trial.

### b) *Factual Issues for Trial*

■ Defendants argue that if the "net economic injury" theory is adopted, summary judgment must be granted on Minpeco's "out-of-pocket" damage claims because Minpeco has failed to produce any evidence of net injury in response to defendants' motion, and, even if Minpeco were given a further opportunity to prove net injury by factoring in the appropriate offset, it would be unable to do so because of deficiencies in its record keeping. These claims, however, present factual questions which can only be resolved at trial.

Principally, there is a factual dispute whether Minpeco's gains on its physical silver positions equalled or were less than its losses on its futures positions. Minpeco has produced evidence indicating that much of its silver futures trading was performed in connection with "back-to-back" contracts by which Minpeco sold silver bullion as an agent for large Peruvian silver producers. To execute these contracts, Minpeco would obtain sales goals from Peruvian silver producers, identify a foreign purchaser, and then enter into simultaneous contracts with the Peruvian silver producer and the purchaser, transferring the key price and economic terms from the purchaser to the seller, and retaining a commission for itself. It is estimated that in 1979 Minpeco sold as an agent approximately 80 to 85 percent of Peru's exported silver through back-to-back contracts.[14]

Minpeco alleges that when silver prices rose dramatically from August to October 1979, Minpeco, on the advice of its brokers, decided to sell silver futures equalling about one quarter to one third of Peru's annual sales of silver to "lock in" these high silver prices, which Minpeco expected would soon drop.[15] Minpeco then sold short about thirteen million ounces of silver. Minpeco, however, estimates that it only owned about two million ounces of physical silver at that time.[16] When the price of silver continued to rise, however, Minpeco became subject to large margin payments and was forced to begin to close its futures positions at a loss. With regard to the short positions based on the back-to-back contracts arranged by Minpeco,[17] Minpeco alleges that because it did not own the physical silver on which these short sales were based, the profits from the increase in the price of silver accrued to the silver producers rather than to Minpeco itself. Thus, genuine issues remain for trial not only as to the amount of out-of-pocket damages to which Minpeco is entitled, if any, but also as to the size of the appropriate offset.

Finally, defendants argue that because Minpeco did not maintain a perpetual inven-

---

**14.** *See* PX 15 at 31–61, 170–173 (deposition of Luis Galliani); PX 22 at 89 (deposition of Adolfo Vinatea).

**15.** *See* PX 14 at 1110–1116 (deposition of I. Fonseca Montoya).

**16.** PX 22 at 397–398 (deposition of Adolfo Vinatea) (estimating the size of Minpeco's silver futures positions and physical silver positions in early 1980). Defendants argue that Vinatea "recanted" these estimates later in the deposition when he indicated that at the time Minpeco was involved in hedging operations—from August 1979 to December 1979—he did not know how much silver Minpeco owned. *Id.* at 663–64. However, drawing inferences in favor of the non-moving party, a fair interpretation of Vinatea's testimony is that while at the time Minpeco set up its hedges he did not know how much silver Minpeco possessed, he later came to know the relevant figures when Minpeco closed its futures positions in 1980. Any inconsistencies

between these two portions of Vinatea's testimony must be resolved at trial.

**17.** Minpeco argues that such positions were bona fide hedge transactions under the Commodity Futures Trading Commission's definition, citing 17 C.F.R. 1.3(z)(3) (1987), which states that "[u]pon specific request made in accordance with ... the regulations" the CFTC may recognize as bona fide hedging "purchases or sales for future delivery on any contract market by an agent who does not own ... the offsetting cash commodity ..., *provided* that the person is responsible for the merchandising of the cash position which is being offset" (emphasis in original). It is noted that there is no evidence that Minpeco ever made such a recognition request to the CFTC. However, Minpeco's adherence or non-adherence to CFTC regulations is not at issue here.

tory record recording its silver holdings for the 1979–80 period and such an inventory cannot be recreated now, it is impossible to determine how much physical silver Minpeco owned at that time, and hence it is impossible to calculate the size of the appropriate offset. Minpeco, however, argues that the total profit on all sales of physical silver during the period in question has already been calculated,[18] providing an accurate basis for measuring the appropriate offset. This issue of proof presents questions of fact and cannot be determined on a motion for summary judgment.

## II. *Lost Profits*

Minpeco's lost profits damage claim is based on the following theory. Minpeco argues that if defendants had ceased their manipulative activity after Minpeco entered the futures market in fall 1979, the price of silver would have dropped as predicted and Minpeco would have closed its futures positions at a profit rather than a loss:

> Minpeco entered the market believing that silver prices were too high in relationship to the cost of production and the forces of supply and demand. It placed its short futures positions to secure these favorable prices. But for the manipulation, Minpeco correctly analyzed the market and should be permitted to obtain the gains which it would have achieved in placing these positions.[19]

Referring to the numerical example discussed earlier, under this theory, if Minpeco could prove at trial that it 1) sold silver futures contracts short in November 1979 at $18 an ounce; 2) closed these positions at a loss at $25 an ounce in January 1980; and 3) could have closed these positions at $8 an ounce in January 1980 absent defendants' manipulative activity, Minpeco would be entitled, in addition to $7 per ounce in actual damages, to lost profits in the amount of $10 per ounce, representing the difference between the manipulated opening price and what the closing price would have been on an unmanipulated market.

Defendants' argument against Minpeco's lost profits claim is essentially the same as their argument, discussed above, in support of requiring Minpeco to prove the offset: that an award of damages "should put a plaintiff forward into the position it would have been 'but for' the defendant's violation of the law," *Los Angeles Memorial Coliseum Commission,* 791 F.2d at 1367, but may not place a plaintiff in a *better* position than it would have been absent the violation. In the lost profits context, defendants argue that in the absence of the high prices allegedly attributable to manipulation, Minpeco would never have entered the futures market, and, even if it had, would been unable to sell short at a high price in November 1979 and hence would have had no opportunity for profit:

> Assuming, *arguendo,* that defendants violated the law and, because of that violation, prices rose above Minpeco's $8–10 an ounce "plateau", in the world that would have existed "but for" the defendants' alleged unlawful conduct, Minpeco could not have made short sales at prices of $16–17 ... because there would have been no manipulation; and prices never would have risen above $10. In the absence of $16–17 short sales, the theory of "lost profits" collapses like a house of cards. Assuming that Minpeco would have sold short at all, the short sale by definition could not have occurred at a price higher than the $10 "plateau" price in a nonmanipulated market; and since that same $10 plateau price would have been the price at which Minpeco, according to its damage theory, would have bought long to cover its short sale, there would have been no difference and hence no lost profit.[20]

**18.** *See* PX 4 ("Report on the procedures performed related to the purchase and sale of physical silver in the matter of *MINPECO, S.A. v. CONTICOMMODITY SERVICES, INC. et al.*") (December 9, 1985).

**19.** Minpeco Memorandum at 45.

**20.** Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment Dismissing Minpeco's Lost Profits Claims at 4 (Nov. 23, 1987) ("Defendants' Supplemental Memorandum").

In support of this argument, defendants cite the settled proposition that "[i]t is essential in every claim for lost profits to prove that there was an opportunity to realize the profits," R.L. Dunn, *Recovery of Damages for Lost Profits*, 370–71 (3d ed. 1987), as well as a line of cases to the effect that a plaintiff is not entitled to lost profits which would have been attributable to defendants' wrongful conduct. *See Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 377, 47 S.Ct. 400, 404–05, 71 L.Ed. 684 (1927) (plaintiff "could not recover damages on the basis of the profits which it had earned while a customer of the defendant to the extent that they had been increased by the monopoly and exceeded those in a normal business, but … they must be reduced to the basis of normal profits"); *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1203 (7th Cir.1986) (holding that "lost profits from the inability to continue to take advantage of inflated prices due to antitrust conduct" are not recoverable); *cf. Crocker v. Federal Deposit Insurance Co.*, 826 F.2d 347, 352 (5th Cir.1987) (holding that plaintiff class of minority shareholders has no standing to sue under RICO where "the scheme that harmed the minority shareholders also presented a unique profit opportunity which the plaintiff class unfortunately missed").

In response, Minpeco argues that lost profits are an established element of antitrust injury and that it has chosen a reasonable methodology for calculating lost profits based on *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 778–779 (S.D.N.Y.1984), *aff'd*, 768 F.2d 22 (2d Cir.1985), the only commodity manipulation antitrust decision to address the issue of calculation of damages. Finally, Minpeco argues that, even if the court accepts defendants' argument, its entire lost profits claim should not be eliminated. Instead,

the economic evidence still supports the conclusion that when Minpeco closed its positions prematurely due to the manipulation, it lost profits for a price drop from $10 to $6, as much as $4 per

ounce[ ] … The adjustment which [defendants] seek would be made simply to eliminate from the damage calculations the effects of the manipulation on the opening prices.[21]

Defendants' argument that Minpeco's lost profits theory is flawed has some merit. To allow Minpeco to recover lost profits based on the full difference between a manipulated opening price and an unmanipulated closing price would indeed seem to contradict the *Eastman Kodak* court's instruction that a plaintiff may not recover lost profits "to the extent that [the lost profits] had been increased by the [antitrust conduct] … but that they must be reduced to the basis of normal profits." *Eastman Kodak*, 273 U.S. at 377, 47 S.Ct. at 405.

Judge MacMahon's decision in *Strobl* is not to the contrary. The *Strobl* case involved a conspiracy to lower artificially the price of potatoes and potato futures. In September and October 1975, Strobl took long positions in potato futures at a cost of $18.30 per hundredweight. By May 4, 1979, the price of potatoes had gone down, and Strobl liquidated his long contracts at about $9 per hundredweight, thus taking about a $9 loss per hundredweight. The defendants were charged and found guilty of a conspiracy to lower the price of potatoes and potato futures. Strobl's damage theory was:

that he lost money as a result of liquidating at an artificially low price and sought as damages the difference between what he actually received when he liquidated his position and what he would have received but for defendants' manipulation.

582 F.Supp. at 773. Or, as the Second Circuit described it: "[T]he damages he claimed were the difference between what he received from the sale of those futures and what he would have received in a fair market." *Strobl*, 768 F.2d at 23. Judge MacMahon ruled that the jury award of $460,000 was not excessively high. In concluding that the verdict was reasonable, Judge MacMahon described the damage theory submitted to the jury as follows:

---

21. Letter to the court from Mark A. Cymrot at 7 (Nov. 23, 1987) ("Cymrot letter").

Having found that defendants' manipulation resulted in artificially low prices during the conspiracy period, the jury had to determine what the prices would have been absent the manipulation. In essence, the jury was required to estimate how much higher the prices would have been when plaintiff liquidated his contracts but for defendants' unlawful conduct, and the court so instructed it. *Strobl*, 582 F.Supp. at 779.

The damage theory applied in *Strobl* is relevant to this case and supports the general framework of Minpeco's damage claims. But *Strobl* provides no support to Minpeco on the specific issue presented here—whether Minpeco can measure its lost profits claim from a manipulated opening price—for the simple reason that it appears that Strobl opened his potato futures positions at a competitive rather than a manipulated price.[22]

■ However, while it is clear, upon consideration, that Minpeco is not entitled to measure its lost profits from a manipulated opening price to an unmanipulated closing price, I cannot conclude, for the reason discussed below, that Minpeco is precluded as a matter of law from attempting to establish at trial that it is entitled to a lesser measure of lost profits.

Minpeco's lost profits claim is different in an important respect from the lost profit claims considered in *Eastman Kodak* and *Local Beauty Supply*. In those cases, the plaintiffs were precluded from recovering profits at the inflated level which had in the past accrued to them as a result of the defendants' anticompetitive activities but which ceased to accrue when these activities ceased. In *Eastman Kodak*, a terminated Kodak dealer who alleged that Kodak had monopolized the market for certain photographic supplies was awarded the lost profits that it would have realized had it been able to continue to purchase Kodak goods after it was terminated, with the restriction that it could not "recover dam-

ages on the basis of the profits which it had earned while a customer of the defendant to the extent that they had been increased by the monopoly and exceeded those in a normal business." 273 U.S. at 377, 47 S.Ct. at 405. Similarly, in *Local Beauty Supply*, a distributor of Lamaur beauty supplies ("Local") sued the Lamaur manufacturer after Lamaur terminated Local's distribution arrangement, alleging that Lamaur had engaged in an illegal price maintenance scheme. The Court of Appeals for the Seventh Circuit held that Local did not have antitrust standing to sue because although "Local attempts to recover lost profits from sales of Lamaur products" resulting from the termination of its distributorship, in fact, "Local's market ... and profits were a direct result of the maintained prices. Local was profiting from the antitrust violation itself." 787 F.2d at 1202.

Here, in contrast, the situation is much more complex. It is at best only half true that the lost profits Minpeco seeks to recover are the "direct result" of defendants' manipulative activity. Although it was the beginning of the manipulation which caused the high silver prices in October–November 1979, both inducing Minpeco to enter the futures market and allowing it to sell short at the $16–$18 price range market, it was the *continuation* of the manipulation *after* Minpeco sold short which prevented Minpeco from realizing the profits which it would have realized if the manipulation had ceased. In contrast to cases such as *Local Beauty Supply*, where the plaintiffs lost profits when the defendants' anticompetitive activities stopped, Minpeco lost profits when the defendants' anticompetitive activities continued. The continuation of the *Minpeco* defendants' manipulative behavior after November 1979 deprived Minpeco of a legitimate opportunity for profit, albeit a profit inflated to a degree by the manipulation.

Under these circumstances I conclude that Minpeco should be allowed to present

---

**22.** This can be gleaned from the facts presented in the Second Circuit's decision in *Strobl*, 768 F.2d at 24, stating that Strobl entered into his long positions in September–October 1975, and

the facts presented in the earlier related case, *Leist v. Simplot*, 638 F.2d 283, 289 (2d Cir.1980), stating that defendants' conspiracy to lower potato prices began in the spring of 1976.

to the jury that portion of its lost profits claim remaining after the opening price at which Minpeco sold short is adjusted downward to account for the impact of the manipulation. In other words, Minpeco is entitled to lost profits to the extent of the proven difference between 1) the price of silver as it would have been at the time Minpeco sold short if the market had been unmanipulated ($10 in the example discussed earlier) and 2) the price at which Minpeco could have closed its short positions at the time it left the futures market if the market had been unmanipulated ($8 in the example discussed earlier).[23] This approach is both equitable and consistent with *Eastman Kodak*. It eliminates the large portion of Minpeco's lost profit claim attributable to the artificial element of the price at which Minpeco sold short, but still allows Minpeco a chance to recover the remaining portion, based on the difference between the non-artificial element of the opening price and what the closing price would have been in the absence of manipulation.[24]

Finally, a few words must be said on the evidence Minpeco has marshalled in support of this reduced lost profits claim. Minpeco's expert witness, Hendrik Houtthaker, has stated that the unmanipulated price of silver in October–November 1979 would have been $10 per ounce, and that the unmanipulated price of silver in December 1979 would have been between $8 and $10 dollars per ounce.[25] Based on this evidence, then, a jury could reasonably award lost profits in the amount of up to two dollars per ounce. Minpeco, however, argues further that a jury could reasonably conclude based on Minpeco's economic evidence that "political and economic events had only a short-term impact of raising silver prices to the $8 to $10 range from their historic $6 level", that but for the manipulation Minpeco would have held open its short positions until the price of silver dropped to $6, and thus that "when Minpeco closed its positions prematurely due to the manipulation, it lost profits for a price drop from $10 to $6, as much as $4 per ounce[ ]." [26] Defendants respond that this claim is untenable because the price of silver in fact continued to rise in 1980 and did not drop back to the $6 level until June 1982.[27] In the face of these facts, Minpeco's claim that it is entitled to lost profits in the amount of $4 per ounce is of dubious validity and, although Minpeco will not be precluded at this time from attempting to prove this claim at trial, the evidence supporting it will be carefully considered at the end of Minpeco's case.

\* \* \* \* \* \*

In sum, defendants' motion is granted to the extent indicated in the opinion and is otherwise denied.

23. The shaded portion of the graph at Appendix A of this decision indicates the portion of Minpeco's lost profits claim which is eliminated by this decision.

24. Defendants argue that Minpeco should not be able to present even this much-reduced lost profits claim, because it would require "the jury ... to infer that Minpeco would have entered the futures market when the price was $10.00, even though, when it actually had the opportunity to do so in the real world, it passed it by. There is not a scintilla of evidence in the record that Minpeco would have sold short at a presumably unmanipulated $10 price." Defendants' Supplemental Memorandum at 9. Minpeco itself does not argue that it would have sold short at $10. But the equitable proposition that a damage award should place the plaintiff in the position he would have been in "but for" de-
fendants' wrongdoing does not require us literally to travel in time back to fall 1979 and imagine what Minpeco would or would not have done if no manipulation had occurred. In this case, it only requires Minpeco to reduce its lost profit claim by excluding that portion which is attributable to the artificial element of the opening price.

25. *See* Exhibits to Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment on the Conspiracy Claims, Section A, Exhibit 81 (Minpeco's Answers to Expert Interrogatories).

26. Cymrot letter at 7.

27. Defendants' Supplemental Memorandum at 10.

Appendix A

<u>Minpeco</u> Damage Claim Graph