**MINPECO, S.A., Plaintiff,**

v.

**Nelson Bunker HUNT, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., Advicorp Advisory and Financial Corporation, S.A., and Mahmoud Fustok, Defendants.**

No. 81 Civ. 7619 (MEL).

United States District Court,
S.D. New York.

May 3, 1988.

---

Cole Corette & Abrutyn, Washington, D.C. (Mark A. Cymrot, Thomas O. Gorman, Pedro R. Pierluisi, Kathleen Milton, of counsel), Grand & Ostrow, New York City, for plaintiff Minpeco, S.A.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Aaron Rubinstein, Paul J. Curran, Stanley D. Robinson, Michael Malina, of counsel), Gardere & Wynne, Dallas, Tex. (Robert E. Wolin, of counsel), for defendants Nelson Bunker Hunt, William Herbert Hunt and Lamar Hunt.

Curtis, Mallet–Provost, Colt & Mosle, New York City (Herbert Stoller, Turner P. Smith, of counsel), for defendant Mahmoud Fustok.

LASKER, District Judge.

This motion arises from the damages decision issued in this action on December 22, 1987, *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 676 F.Supp. 486 (S.D.N.Y. 1987).[1] That determination 1) eliminated a portion of Minpeco's lost profits claim and 2) concluded that it was Minpeco's burden to offset its claim of actual damages by the "measure of the increase in value which accrued to its own physical silver holdings ... as a result of defendants' allegedly manipulative behavior," 676 F.Supp. at 490. While it was concluded that "Minpeco's damage calculations must account for the profits as well as the losses which it experienced as a result of defendants' manipulative behavior," it was noted that "it is premature without full briefing by the parties to determine the exact contours of the appropriate offsets which must be applied to Minpeco's various out-of-pocket damage claims." *Id.* at 490 n. 13.

After the December 22 opinion was filed, Minpeco directed its accounting firm, Grant Thornton, to prepare a revised damage esti-

---

1. Familiarity with the facts and issues of that decision is assumed.

mate to reflect both the lower lost profit claim and the offset to Minpeco's actual damages claim mandated by the December 22 opinion. The first Grant Thornton report, issued in March 1987, had calculated damages at between $225,204,693.65 and $252,724,693.65, depending on the "plateau" price—the alleged competitive price of silver—assumed. The revised Grant Thornton report, issued in January 1988, taking into account the reduced lost profits claim and the gains as well as the losses Minpeco experienced through its silver futures activities and its physical silver holdings, calculates damages at between $149,728,929.72 and $172,548,956.11, depending on the plateau price.

Defendants now argue that the revised Grant Thornton report is insufficient to sustain Minpeco's burden of proof with regard to the appropriate offset to Minpeco's claim for actual damages. Hence, they move again to dismiss Minpeco's damage claim in its entirety, or, in the alternative, for a ruling in limine precluding proof of certain components of its damage claim.[2] Defendants first argue that because Minpeco has only calculated its offset from August 1979 through March 1980, whereas the price of silver did not fall back to the $6 level—which Minpeco alleges to be silver's natural, competitive price—until June 1982, Minpeco has failed to meet its burden to calculate its offset and the case should be dismissed. Defendants next contend that even if the case is not dismissed, certain damage claims which are asserted for the first time in the revised Grant Thornton report should be precluded. Third, defendants assert that Minpeco should be precluded from asserting a damage claim for $48 million dollars to cover the interest payments resulting from loans required to close Minpeco's silver futures and forward positions in 1979–1980.

## I. Offset Question

■ In the revised Grant Thornton report, Minpeco calculates the offsetting benefits which it received from the alleged manipulation for the period from August 1979 to March 1980. Defendants point out, however, that the price of silver did not return to a $6 level until June 1982, and that Dr. Houthakker has stated that "the holding of large inventories by the Hunts distorted the price of refined silver for several years after 1980."[3] Hence, defendants argue that under the December 22 opinion Minpeco is obligated to calculate its offsetting benefits through May 1982, and that Minpeco's damage claim should be dismissed in its entirety because of its failure to do so.

Minpeco responds that the period it chose for calculating the offset, August 1979 through March 1980, is reasonable and comports with the December 22 decision because it is the period during which Minpeco suffered the majority of its losses, and, more importantly, it was the period during which the defendants were allegedly actively manipulating the silver market—that is, the period during which silver prices were artificial. It is Minpeco's position, based on its expert's testimony, that after March 1980, silver prices, although higher than before the alleged conspiracy period, were competitive because they reflected information available to all in the marketplace.

To determine the length of the offset period, Minpeco asked Dr. Houthakker to determine when silver prices ceased to be artificial. Houthakker responded that in his opinion, based on various economic indicia, "the prices prevailing in the silver futures market beginning on approximately April 1, 1980 were competitive prices"[4] because "the silver and silver futures markets were no longer being directly affected by the defendants' manipulative activi-

---

**2.** Moving defendants are Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, and Mahmoud Fustok.

**3.** H. Houthakker Statement, Exhibit I to Minpeco's Answers to Expert Interrogatories, March 31, 1987 at p. 21.

**4.** Minpeco's Memorandum in Opposition to Defendants' Motion to Dismiss Minpeco's Damage Claim ("Minpeco Memorandum") (March 9, 1988), Exhibit 3, Affidavit of Hendrik S. Houthakker at 1 (March 8, 1988).

ties."[5] Houthakker argues that the key factor accounting for the higher post-conspiracy prices was additional information about the market resulting from public knowledge of the conspiracy:

> [t]he post-manipulation silver price is a competitive price which reflects additional information regarding the structure of the silver market. Reflected in the price are such factors as fears of future manipulations, by either the defendants or others, and reports of the Hunts' holdings of physical silver. This information resulted in new estimates of the value of silver and silver futures and new competitive prices than those prevailing prior to June, 1979.[6]

Minpeco analogizes the appropriate offset period here to that used by the Court of Appeals for the First Circuit for disgorgement of profits in insider-trading cases under the securities laws. In *SEC v. MacDonald*, 699 F.2d 47, 52–55 (1st Cir.1983) (en banc), the First Circuit imposed a limitation on the disgorgement of damages: a defendant who has purchased stock based on inside information is required to disgorge only the profits representing the increased value of the shares at a reasonable time after public dissemination of the information. 699 F.2d at 53. The *MacDonald* court explained that:

> [w]hen a fraudulent buyer has reached the point of his full gain from the fraud, viz., the market price a reasonable time after the undisclosed information has become public, any consequence of a subsequent decision, be it to sell or to retain the stock, is ... not causally related to the fraud.

*Id.* at 54. *Accord, Donovan v. Bierwirth*, 754 F.2d 1049, 1057 (2d Cir.1985) (citing cases); *see also SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir.1974) ("A violator of the securities laws should dissolve profits earned by trading on non-public information. Once public disclosure is made and all investors are trading on an equal footing, the violat[o]r should take the risks of the market himself").

Minpeco, analogizing to this rule of law, argues that

> [s]imilarly, Minpeco's damages and offsets should be limited to the period in which defendants' manipulative activities caused the prices prevailing in the silver markets to be artificial. Once a new competitive price was established, defendants' manipulative actions cannot be said to have been the proximate cause of any subsequent gains or losses.[7]

As discussed above, although the December 22 decision held that Minpeco "must account for the profits as well as the losses which it experienced as a result of defendants' manipulative behavior," that decision also left open the question of "the exact contours of the appropriate offset[ ]." 676 F.Supp. at 490 n. 13. Here, it cannot be concluded that the limiting principle which Minpeco has applied to the offset is unacceptable as a matter of law. Minpeco's analogy to *SEC v. MacDonald* is sound, and its argument, based on Dr. Houthakker's affidavit, in support of the period chosen to calculate the offset is reasonable. Although after the end of the alleged conspiracy period the price of silver only gradually decreased to the $6 level, that fact does not automatically necessitate a finding that the alleged manipulation was the proximate cause of the above $6 silver prices which lingered after March 1980. Rather, a jury could reasonably conclude, as Minpeco argues,

> that the post-March price was the product of the marketplace, including all information in the market at that time. Free trading among traders, with [ ] increased knowledge, including recognition of the large positions in the market, and its susceptibility to manipulation, led to the establishment of a new price level in the market.[8]

---

**5.** *Id.* at 3.

**6.** *Id.*

**7.** Minpeco Memorandum at 22.

**8.** Minpeco Memorandum at 25–26 (footnotes omitted).

Accordingly, defendants' motion to dismiss Minpeco's damage claim for failure to establish its offset is denied.[9]

## II. Preclusion of Certain Damage Claims

Defendants next argue that if Minpeco's damage claim is not dismissed in its entirety, three specific damage claims should be precluded: the first two are claims which allege losses sustained in connection with Minpeco's physical silver holdings, which defendants contend must be precluded because they involve claims of losses suffered after March 31, 1980, the conclusion of the offset period under Minpeco's theory; the third is a claim which alleges losses on the futures market in connection with BCRs 3[10] and 4, that defendants assert must be precluded because it was alleged for the first time in the revised Grant Thornton report. I conclude that these damage claims are not barred as a matter of law.

### 1) *Losses on Silver and Concentrate Allegedly Priced Prior to March 1980 and Later Sold or Written Off*

■ Minpeco's revised Grant Thornton damage report includes a claim for $13,103,774.70 for purchases of silver and lead concentrate (with silver content) that Minpeco bought at high prices during the alleged conspiracy period, when Peruvian miners were increasing their production, and which Minpeco had to sell at lower prices or write off after the end of the alleged conspiracy period, when silver prices plummeted. Defendants argue that because this damage claim extends beyond the period after March 31, 1980, it would be unfair to allow Minpeco to assert this claim unless it calculates its offset for the post-March 1980 period. Minpeco responds that

this claim legitimately reflects transactions affected by the manipulated price and that defendants are trying to "pick and choose among Minpeco's physical silver transactions, only identifying the gains and ignoring the losses."[11]

The claim is permissible: although it does reflect losses sustained during the post-conspiracy period, these losses were allegedly *caused* by the higher prices that occurred during the August 1979–March 1980 period. Hence, it is not inconsistent to permit Minpeco to limit its offset to the period through March 1980 and nevertheless to present this silver purchase claim to the jury.

### 2) *Post–March 1980 Purchase Prices of Silver for Return to BCR in BCR transactions 1 through 4*

■ Here, defendants argue that Minpeco has undervalued part of its offset calculation. In the BCR 1 through 4 transactions, Minpeco borrowed 1,786,474.05 ounces of silver from the Banco Central during the alleged conspiracy period, and sold the borrowed silver at the higher conspiracy period prices. Then, after the conspiracy period was over, Minpeco had to purchase silver to repay the bank. In calculating the offset based on these transactions, Minpeco compared the revenues from its initial sales of BCR silver ($38,282,100.19) to the cost of purchasing the silver to return to the BCR ($30,175,910.14), for a net offset of $8,106,190.05. Defendants argue, in effect, that instead of making this calculation, Minpeco should have compared its initial sales revenues at the higher conspiracy period prices to what those revenues would have been at the plateau price, and that Minpeco imper-

---

**9.** In a letter dated March 30, 1988, Minpeco states that it "is prepared to demonstrate [at trial] that its losses far exceed its gains even under defendants' [offset] theory." Letter to Court from Mark A. Cymrot at 2 (March 30, 1988). According to Minpeco, Grant Thornton has now calculated that Minpeco's gains, excluding normal profits, for the period April 1980 through May 1982 total approximately $8.9–$11.6 million. Defendants object to Minpeco's introduction of this evidence at this point in the trial as untimely. Letter to Court of Michael Malina at 2 (March 31, 1988). In light of the

instant decision on the offset issue, the question whether Minpeco may properly introduce evidence of its offset through May 1982 will not be addressed here.

**10.** The term "BCR" refers to five physical silver transactions in which Minpeco borrowed—or in one case bought—physical silver from Peru's national bank, Banco Central de Reserva.

**11.** Minpeco Memorandum at 19.

missibly subtracted costs incurred after March 31, 1980 from revenues received before that date. Minpeco's method of calculating this offset is not unreasonable: inclusion of the cost of returning the silver to the BCR after the end of the alleged conspiracy period is necessary to any fair calculation of the net economic effect of those transactions. Minpeco is not precluded from presenting this damage claim to the jury as a matter of law.

### 3) *Claims for Losses on BCR 3 and 4 Futures Hedges*

· ■ Minpeco, in its revised damage report, asserts a claim for $9,867,052.72 for losses on its BCR 3 and 4 futures hedges. Prior to the revised report, however, Minpeco had never claimed losses on BCR futures transactions other than its hedge losses on BCRs 1 and 2. Defendants argue that there is no justification for asserting new *futures* claims at this time, because the Dec. 22 decision only required Minpeco to calculate its gains and losses from its physical silver holdings.       ·

In response, Minpeco states that BCRs 3 and 4 are included in the revised report, but not the earlier reports, "because (1) the silver obtained through these transactions was used to close the silver futures contracts upon which Minpeco is claiming damage and (2) the report is intended to include all physical silver transactions conducted by Minpeco during the relevant period." [12] Minpeco also points out that the revised report factors into the offset a $2.9 million *gain* in the futures market that had not been stated in earlier reports, arguing that:

> [t]he rationale for including these profitable futures operations is the same as the one for including the negative results on the BCR futures. Consistent with the Court's December 22 decision, Minpeco's damage claim is now based on the net result of the totality of Minpeco's silver transactions in the manipulation period.[13]

Although arguably the BCR 3 and 4 futures claim is a suitable candidate for preclusion on the grounds of untimeliness, defendants do not argue that the addition of these futures claims at this stage in the litigation has prejudiced them in any significant way nor subjected them to unfair surprise. Moreover, there is merit to Minpeco's argument that it is simply presenting all possible debits and credits in the total universe of its silver transactions, as required by the December 22 decision but not before. Accordingly, this claim is not dismissed.

### III. Interest on Borrowed Funds

■ In the revised Grant Thornton report, Minpeco asserts a claim for $48,903,-948.85 to cover the cost of borrowing money which was required to meet margin calls and close silver futures and forward positions. Minpeco borrowed approximately $81.2 million to meet its margin payments in December 1979. It made all principal and interest payments, with interest calculated at prevailing market rates, until mid-1983, when the Government of Peru made a capital contribution to Minpeco by assuming its outstanding liability. This claim was mentioned although not calculated in the earlier damage report, and the record reflects that defendants have taken discovery concerning this borrowing.

Defendants argue that the interest claim is, as a matter of law, a claim for prejudgment interest. Defendants argue that a

> claim for the cost of borrowed funds stands on no different footing than a claim based on the cost of using the plaintiff's own working capital in lieu of borrowing to pay for the alleged losses. As a matter of law, neither claim is anything more than a claim for prejudgment interest.[14]

If defendants' argument were to be accepted, this interest claim would have to be

---

**12.** Minpeco Memorandum at 8.

**13.** Minpeco Memorandum at 20 n. 42.

**14.** Memorandum Of Law In Support Of Defendants' Motion To Dismiss Plaintiff's Damage

Claim In Its Entirety Or, In The Alternative, For Rulings In Limine Precluding Proof Of Certain Components Of Its Damage Claim ("Defendants' Memorandum") at 25–26.

excluded from Minpeco's damage claim: prejudgment interest is granted only sparingly in antitrust actions, it can only be calculated at the close of trial after damages, if any, have been established, and it may not be included for the purposes of trebling damages.

Defendants rely primarily on *Southern Pacific Transportation Co. v. United States*, 471 F.Supp. 1186 (E.D.Cal.1979). In that case, the plaintiff railway sued the United States under the Federal Tort Claims Act ("FTCA") for damages arising out of an explosion. The damage claim included a claim for "loss of use of plaintiff's property and capital." *Id.* at 1188. Because the FTCA does not allow prejudgment interest, the court considered the question whether a claim for loss of use of capital was actually a form of prejudgment interest, and concluded that it was. The court rejected plaintiff's argument that "loss of use of corporate capital must necessarily be different from prejudgment interest because ... the actual monetary losses incurred from the loss of use of capital can be proven," *id.* at 1193. The court concluded that although clearly the railway had suffered losses because of the diversion of its corporate capital occasioned by the explosion, the railway could not recover these losses because "compensation for the loss of use of money is, by definition, interest," *id.* at 1197, and hence the claim was impermissible under the FTCA.

Minpeco argues here that it does not seek to recover for the diversion of corporate capital but rather for the cost of money actually borrowed as a result of defendants' alleged manipulation. However, defendants point to dicta in footnote 5 in *Southern Pacific*, 471 F.Supp. at 1199, in which the court elaborated on its comment that "[t]he fact that Southern Pacific might prove actual damages from the loss of use of corporate capital does not change the nature of those damages," *id.* at 1199:

> No rational distinction can be drawn between the interest paid on a loan necessitated by the explosions and the losses occasioned by what amounts to an internal loan whereby Southern Pacific withdrew funds allocated for one project to reassign them to the reconstruction of the trainyard. Both claims would constitute compensation for the use of money.... If the company uses funds borrowed from another entity, then it suffers under the requirement that it pay interest on the loan, which requirement occurs because the award of damages for the injury has not yet been paid. Under this logic, neither injury is compensable because of the bar to awards of prejudgment interest.

471 F.Supp. at 1199 n. 5.[15]

Although the *Southern Pacific* footnote presents an interesting argument, I am not persuaded by the suggestion that there is no distinction between an internal diversion of corporate funds, on the one hand, and interest paid on an actual loan on the other. To the contrary, it seems logical to conclude that while the former amounts to a lost opportunity for profit, the latter is an actual expense, a claim for actual damages which should be treated like any other damage claim.

The conclusion that Minpeco's claim for interest payments is distinguishable from prejudgment interest is supported by decision by the Court of Appeals for this circuit in *Bulk Oil, Inc. v. Sun Oil Trading Co.*, 697 F.2d 481 (2d Cir.1983). There, Bulk Oil had contracted to sell a buyer $4,000,000

---

**15.** Defendants also cite two other circuit court cases, *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983) (awarding prejudgment interest at prime rate on lost profits claim), and *H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1124 (6th Cir.1976) (affirming decision to deny patent plaintiff increased damages to account for the present value of amounts earned in the infringement period), but these cases are not on point, since neither involves or discusses the issue whether interest payments on a loan are distinct from prejudgment interest. *Cf. Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 996 (5th Cir. 1983) (rejecting argument by antitrust defendant that an adjustment to a damage estimate to create a net present value for the previous injury was in essence a claim for prejudgment interest, but distinguishing claim from one for "bare interest"), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

worth of fuel oil. To perform, Bulk bought the oil from a third-party supplier and financed the transaction by borrowing from a bank. After the buyer refused to pay for the delivery, Bulk incurred continuing interest charges.

The *Bulk Oil* court, after determining that post-breach interest payments were recoverable under the relevant provision of the New York Uniform Commercial Code, considered the question whether Bulk was entitled to prejudgment interest on these interest payments. First, the court noted that prejudgment interest is founded on the principle:

> that the aggrieved party has been damage[d] by a loss of the use of money or its equivalent and that unless interest is added the party aggrieved is not made whole. Statutory interest is compensation for the use of money.

697 F.2d at 484–85. The court then went on to conclude:

> The post-breach interest charges incurred here were deducted by [the bank] from Bulk's account on a monthly basis and were thus out-of-pocket payments. Bulk lost use of its money from the date of each payment and can only be made whole for such damage by recovery of statutory pre-verdict interest from the date of each such payment. Bulk is no less entitled to recover statutory interest on such expenditures than it would be on any other expense cognizable as incidental damages under [the relevant statute].

*Id.* at 485.

Although the issue at hand was not actually argued to the *Bulk Oil* court, and there are factual and legal distinctions between *Bulk Oil* and the present case—just as there are between *Southern Pacific* and the present case, the Second Circuit's direct holding in *Bulk Oil* provides significant support for Minpeco's position. The *Southern Pacific* court mused that a claim for interest payments would be equivalent to a claim for prejudgment interest because both "would constitute compensation for the use of money." 471 F.Supp. at 1199 n. 5. The *Bulk Oil* court, however, while recognizing that prejudgment interest "is compensation for the use of money," 697 F.2d at 485, expressly held that Bulk was entitled to be made whole for its interest payments and that Bulk was "no less entitled to recover statutory interest on [interest payments]," *id.*, than on any other cognizable damage claim.

Accordingly, defendants' motion to preclude Minpeco's claim for interest payments is denied.

\* \* \*

In sum, defendants' motion to dismiss or in the alternative for preclusion is denied. It is so ordered.