**MINPECO, S.A., Plaintiff,**

**v.**

**Nelson Bunker HUNT, William Herbert Hunt, International Metals Investment Co., Ltd., Naji Robert Nahas, Gilion Financial, Inc., Advicorp Advisory and Financial Corporation, S.A., and Mahmoud Fustok, Defendants.**

**No. 81 Civ. 7619 (MEL).**

United States District Court,
S.D. New York.

July 18, 1989.

As Amended Aug. 15, 1989.

Cole, Corette & Abrutyn, Washington, D.C., for plaintiff, Minpeco, S.A.; Mark A. Cymrot, Thomas O. Gorman, Pedro R. Pierluisi, William P. McGrath, Jr., Kathleen M. Milton, James M. McNamara, Jr., Washington, D.C. and Grand & Ostrow, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City; Paul J. Curran, Stanley D. Robinson, Aaron Rubinstein, Michael Malina, Joel Katcoff, Phillip A. Geraci, Manvin S. Mayell, Marsha Rubin, William J. Schneier, and David S. Copeland, of counsel, and Gardere & Wynne, Dallas, Tex.; Robert E. Wolin, of counsel, for defendants Nelson Bunker Hunt and William Herbert Hunt.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant, Mahmoud Fustok; Herbert Stoller, of counsel.

"Doar, Devorkin & Rieck, New York City; John J. Rieck, Jr., of counsel and Thomas J. Curnes, Dallas, Tex., for defendant, Intern. Metals Inv. Co., Ltd."

LASKER, District Judge.

In August, 1988, Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, Mahmoud Fustok, and International Metals Investment Company were found liable to the plaintiff Minpeco, S.A. ("Minpeco") for violations of the Commodities Exchange Act ("CEA"), the federal antitrust statutes, and New York common-law fraud; all but Lamar Hunt were also found to have acted in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Judgment was entered for the plaintiff in excess of $132 million, which included compensation for short futures losses, interest paid on loans obtained to cover margin calls and close silver futures and forwards positions, and lost profits. This decision

addresses the motions for judgment notwithstanding the verdict ("jnov") or, in the alternative, for a new trial, pressed by Nelson Bunker Hunt, William Herbert Hunt, International Metals Investment Company and Mahmoud Fustok ("the defendants").[1] Familiarity with the facts and earlier decisions in the case is assumed.

The defendants challenge both Minpeco's legal claims and the damages awarded. The motion for jnov on the plaintiff's legal claims challenges: 1) the antitrust verdicts on the grounds that there was insufficient evidence to support the finding of the relevant market and that, as a matter of law, the shares of the defendants should not have been aggregated to determine market power, 2) all claims on the ground that there was insufficient evidence to establish causation, 3) the common-law fraud claim on the grounds that a fraud on the market theory is not available at common-law and that, even if it were, the evidence does not establish the elements of intent and reliance, and 4) the RICO verdict to the extent it depends on the finding of common-law fraud and on the ground that the plaintiff has not established injury "by reason" of a RICO violation.

In addition, the defendants make the following arguments with respect to damages: 1) there is no evidence to support the award of lost profits, 2) the damage award for interest on borrowings is not subject to trebling, 3) the verdicts on interest on the indebtedness and losses on short trading are irrational and inconsistent and thus compel a new trial, and 4) the judgment must be offset by $45.68 million, the amount of Minpeco's loan assumed by the State of Peru. The defendants preserved these arguments in extensive motion practice before the jury was given the case.[2]

The discussion below evaluates the defendants' arguments in light of the standard applicable to jnov motions: "A trial court may grant or deny a [motion for] j.n.o.v. if the evidence leads to only one reasonable conclusion when the witnesses' credibility and the weight of the evidence are not taken into account." *Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 508 (2d Cir.1989) (citation omitted). In the case at hand, despite the serious nature of the defendants' arguments, when the evidence is construed in the light most favorable to Minpeco as it must be on a jnov motion, it cannot be said that the jury verdict was unreasonable. *Id. See also Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988). Moreover, to the extent the arguments pose renewed challenges to the legal theories on which the claims were presented to the jury, the arguments are unpersuasive.

### 1. Antitrust

#### *A. Evidence of Relevant Market*

The defendants contend that there was insufficient evidence to support the jury's finding that the relevant market consisted of the December 1979 Comex, February 1980 CBT, and March 1980 Comex contracts, together with the supply of physical silver deliverable on those expiring contracts located in the warehouse.[3] As the defendants emphasize, Dr. Hendrik Houthakker, the plaintiff's only witness who testified about the relevant market, acknowledged that he excluded .999 silver located outside the warehouse from his analysis because it was "his understanding" that it took a few weeks to process the silver to make it deliverable. He

1. Soon after the judgment was entered, Nelson Bunker Hunt and William Herbert Hunt filed for personal bankruptcy; the bankruptcy court has granted them leave from the automatic stay to pursue their challenge to this judgment. Lamar Hunt subsequently settled his case with the plaintiff. Although Fustok remains a party to these motions, consideration of motions for jnov or a new trial made solely on his behalf is deferred pursuant to the terms of a stipulation and order of June 23, 1989.

2. The discussion of the motions is somewhat abbreviated. Many of the arguments received extensive consideration when first raised and all have been amply considered in the context of these motions.

3. An absence of proof of the relevant market would be fatal to plaintiff's antitrust claims. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

believed the source of this understanding was a "statement by the official in charge of entering silver in the Chicago warehouse." Trial Transcript ("TR") at 8787.

Despite its limitations, this testimony suffices to support the jury verdict. The shortcomings of Dr. Houthakker's knowledge present a question of credibility for the jury. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987) (citation omitted). *See also Loudermill v. Dow Chem. Co.,* 863 F.2d 566, 570 (8th Cir.1988).

Moreover, this case does not fall outside the "general rule." It cannot be said, as was true in *Viterbo,* in which the court on a motion for summary judgment excluded the testimony of plaintiff's expert, that the "opinion simply lack[ed] the foundation and reliability necessary to support expert testimony" and thus could not serve its purpose of "assist[ing] the jury in arriving at its verdict." *Viterbo,* 826 F.2d at 424. In this case, Houthakker's opinion was more than the plaintiff's "testimony dressed up and sanctified as the opinion of an expert." *Id.* Houthakker, who is the Chair of the Economics Department at Harvard University, not only testified that his understanding derived from a warehouse official, but also that his analysis confirmed his understanding of the amount of time it took to process silver so as to make it deliverable in accordance with the rules of the exchanges. TR at 8794–95. Finally, the defendants alerted the jury to the limitations of Houthakker's testimony and offered testimony indicating that the process took very little time, and both sides' contentions as to the relevant market were presented to the jury in the charge.

### *B. Aggregation*

The defendants pose a renewed challenge to claims of monopolization and attempt to monopolize under § 2 of the Sherman Antitrust Act[4] because they are premised on the aggregation of the defendants' shares to establish market power. The defendants are now armed with a new Second Circuit decision affirming the district court's dismissal of the plaintiffs' antitrust claims, based in part on a holding that the positions of the defendants in that case could not be aggregated to determine whether they had monopoly power where the defendants were charged with attempting to monopolize a market involving dental equipment. *H.L. Hayden Co. v. Siemens Medical Sys., Inc.,* 879 F.2d 1005, 1018 (2d Cir.1989).

However, my reason for not charging the jury, as the defendants requested, that it could consider only the monopoly power of *each* defendant remains applicable: "[U]nless joint action is charged and proven, the law does not permit the aggregation of market shares to establish monopoly power, but if joint action is charged and proven, it does permit aggregation." TR at 15619. In the case at hand, the plaintiff alleged not that the defendants conspired to manipulate the market but that the defendants, having conspired, monopolized and attempted to monopolize the silver futures market and thus joint action was essential to the section 2 charges, TR at 15618–22. In fact, the jury was charged that it could not consider the antitrust claims unless it found the plaintiff to have proven the existence of a conspiracy, TR at 16720.

Neither the recent circuit decision in *Hayden* nor the district decision, *Hayden Co. of N.Y. v. Siemens Medical Systems,* 672 F.Supp. 724, 741 (S.D.N.Y.1987), which was considered at the time of the charge, requires a contrary result because neither speaks to the propriety of aggregating market shares when the defendants are charged with joint action to monopolize or

4. Before the case was sent to the jury, Minpeco agreed to drop the charge of conspiracy to monopolize in order to clarify the charge; it continued, however, to press its claims that "there was a monopoly here by conspiracy or there was an attempt to monopolize the market by the conspiracy. Those are separate claims from the claims of conspiracy to monopolize." TR at 15567.

attempt to monopolize the relevant market. In fact, in *Hayden,* the district court found, and the Court of Appeals affirmed, that there was insufficient evidence of a conspiracy between the defendants. 672 F.Supp. at 743 n. 24, *aff'd,* at 1019. Moreover, other courts have indicated that, where joint action is alleged, as it was in this case, the shares of the defendants may be aggregated to establish market power. *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 619 F.Supp. 441, 451 n. 8 (N.D.Cal.1985) (refusing to aggregate individual defendant's market shares where "there is no evidence that the defendants acted jointly"), *aff'd,* 812 F.2d 1160 (9th Cir.1987), *withdrawn and reh'g en banc granted,* 841 F.2d 1010 (9th Cir.1988); *Ralph C. Wilson Indus. v. American Broadcasting Co.,* 598 F.Supp. 694, 704 n. 10 (N.D.Ca.1984) ("Absent a conspiracy among defendants, plaintiff may not aggregate the respective market shares of individual defendants to establish market power"), *aff'd,* 794 F.2d 1359 (9th Cir.1986). *Cf. Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261 (2d Cir.1989) (affirming decision that "intertwined relationship among [defendants] warrant[ed] attribution of aggregate market power to [a defendant]" in claim arising under § 7 of the Clayton Act). Finally, my decision in *Consolidated Terminal Sys. v. ITT World Communications,* 535 F.Supp. 225, 228–29 (S.D.N.Y.1982), that the defendants' market power was not to be combined is distinguishable for two significant reasons: 1) the plaintiff's allegation of conspiracy was conclusory and 2) an aggregation of market power would have been tautological, because the plaintiff named as defendants all companies authorized to compete in the market at issue.

2. Causation

■ Defendants contend that there was insufficient evidence to establish that 17 of the 48 silver trading accounts were controlled by members of the conspiracy. Therefore, according to the defendants, the verdict on all counts must be set aside because the testimony as to causation and damages undisputedly depended on an analysis that included all 48 accounts.[5]

■ I agree with the defendants that, even drawing all inferences in favor of the plaintiff, there is insufficient evidence to establish that the defendants controlled every one of the 17 accounts at issue. For example, plaintiff's account of the evidence as to Dale and Gordon Huddleston only establishes that their silver trading paralleled that of other conspirators. There is simply no mention of any relationship between these two Huddlestons and the defendants that would suffice to support a jury finding that one of the defendants controlled the Huddleston accounts. Moreover, proof of parallel conduct is insufficient to support a finding that the Huddlestons were conspirators. *See Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). Nevertheless, that insufficiency does not doom the legal sufficiency of the proof of causation or damages.

It is true, as the defendants contend, that to prove causation, the plaintiff must establish that the defendants' *illegal* conduct caused plaintiff's injury. *See, e.g., MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

> In private antitrust actions, the burden is placed upon the plaintiff to show that the damage claimed was in fact caused by the unlawful acts of the defendant and did not result from some other factor, such as management problems, a recession in the economy or lawful competition by the defendant.

*R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954, 964 (M.D.Pa.1981) (citations omitted). It is also true, however, that the plaintiff need only prove that the defendants' conduct was a *proximate* cause of

5. This argument was presented in a motion for a directed verdict; judgment was reserved and the defendants advised that the motion would be treated as one for jnov.

its injury.[6] Although plaintiff's proof of causation depended upon an analysis that factored in some legal conduct, as indicated below in more detail, it cannot be said, in light of the limited amount of trades made by defendants' accounts, that a reasonable juror could not find that the defendants' illegal conduct played a substantial part in bringing about the artificial price.

Even *Farley Trans. Co. v. Santa Fe Trans. Co.*, 786 F.2d 1342, 1350 (9th Cir. 1985), a case upon which the defendants rely, emphasizes that the plaintiff need only prove that the defendants' conduct was a proximate cause of the plaintiff's injury. The *Farley* plaintiff presented proof of damages that did not specify the portion of its injury attributable to the illegally contracted portion of the defendant's piggyback arrangement. However, the court found that the plaintiff's proof of causation sufficed if there was evidence of "*some* injury attributable to *unlawful* competition by [the defendant]." *Id.* at 1349 (emphasis in the original). *See also United States Football League v. National Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988) (quoting with approval district court instruction charging the jury that "plaintiffs do not have to prove that the unlawful activity that the defendants allegedly engaged in was the sole cause of their injuries.... Plaintiffs need only show that their injury to *some* degree resulted from defendants' violation.") (emphasis in original); *Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) ("[Plaintiff's] burden of proving the fact of damage under ... the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.").

Evaluated under this standard, it cannot be said that no reasonable juror could find, based on the evidence presented, that the defendants' illegal acts proximately caused Minpeco's injury. Although the analysis of causation included some lawful conduct, that conduct was of very limited significance when considered in the context of the accounts clearly controlled by the defendants. Minpeco contends, and the defendants do not dispute, that the trades at issue accounted for only approximately 12% of the December 1979 Comex, 2–4% of the February CBT, and 2–4% of March 1980 Comex stocks said to have been controlled by the defendants. Moreover, although the evidence did not establish that all seventeen of the "disputed" accounts were controlled by the defendants, the evidence was undoubtedly sufficient to establish defendants' control of some accounts, as, for example, the accounts of the children of Nelson Bunker Hunt.

The arguments as to the proof of damages are similar. Defendants maintain that the plaintiff failed to prove damages that "reflect only the losses directly attributable to *unlawful* competition." *MCI*, 708 F.2d at 1161 (emphasis in the original). In support of their argument, they invoke several antitrust cases reversing jury verdicts and remanding cases for a new trial as to damages, because the particular jury award reflected compensation for legal as well as illegal acts of the defendants.

For example, in *MCI*, plaintiff's damage study assumed that all 22 of the acts charged against AT & T were illegal, but liability was established with respect to only seven. The court found that the damage study did not "set forth any information that would permit the jury to adjust the damages in the event that AT & T were successful on any of the counts in the complaint." *Id.* at 1163. Similarly, in *Farley*, 786 F.2d at 1352, the court reversed the verdict and remanded for a new trial as to damages because the plaintiff failed to segregate the damages attributable to lawful competition from those attributable to the unlawful scheme. Finally, in *Universal Amusements Co. v. General Cinema*

6. In the case at hand, the jury was instructed that, to prevail on the CEA and antitrust claims, the plaintiff had to prove that the conspiracy played a *substantial* part in bringing about or actually causing the artificial price, TR at 16719, 16721, and that to prevail on the common law fraud and RICO claims, the plaintiff had to prove its injuries were proximately caused by or by reason of defendants' actions, TR at 16728, 16734.

*Corp.*, 635 F.Supp. 1505, 1526 (S.D.Tex. 1985), looking to *MCI,* the court granted the defendants' motion for a directed verdict because the damage model relied on too many inadequately supported assumptions. Specifically, the court found that "[s]ince the model left the jury no reasonable or principled way to adjust the damage amount if it so found any defendants innocent, [or certain acts innocuous] the model could not support a jury award." *Id.*

In the case at hand, as in those cited by the defendants, the damage calculations reflect compensation for legal activity. However, in those cases in which the courts have vacated the damage award, the plaintiff has failed to account for lawful conduct much more significant than that at issue in this case. As the court itself emphasized in *MCI,* when distinguishing the case from that of *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir.1982), *aff'd,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984),[7] "the extent of the lawful conduct [in *Spray-Rite* ] was insubstantial in relation to the damages." *MCI,* 708 F.2d at 1163. In contrast, the activity that the jury failed to find unlawful in *MCI* was so "quantitatively significant" and such a "major premise" of the damage study that reexamination of the damages was necessary. *Id.* at 1164.

Similarly, in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir.1975), the claimed damages represented not only the sales plaintiff would have made but for the defendants' unlawful conduct in its factory dealership, but also the sales which plaintiff would have made but for the mere existence of the factory dealerships. The *Coleman* court emphasized that

> plaintiff's projections fail to account for *significant* factors bearing upon its diminished market share. The damage figures advanced by plaintiff's experts may be *substantially* attributable to lawful competition. In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.

(emphasis added) (footnote omitted). *Cf. MCI,* 708 F.2d at 1162 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of *significant* other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damages.") (emphasis added).

By addressing the effect on the market of political and economic factors, Minpeco accounted for the significant legal factors affecting the price of silver during the time at issue. Moreover, the seventeen "disputed" accounts, even if none was controlled by the defendants, represented a small proportion of the trades factored into the causation and damage calculations. Thus, unlike *MCI,* the lawful conduct that was reflected in the damage calculations was not so "significant" as to justify a reexamination of the damages.

### 3. Common Law Fraud

#### *A. Fraud on the Market*

In 1982, the defendants' motion to dismiss the common-law fraud claim was denied. *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 552 F.Supp. 332, 335 (S.D. N.Y.1982). The defendants now contend, as they did in their motion for a directed verdict, that "the substantial body of post-1982 federal cases ... have held that a fraud on the market theory is not available under the common law of fraud."

The defendants cite no authority for their position from the Second Circuit or the New York state courts so holding,[8] but

7. The *Spray-Rite* court affirmed the jury verdict despite ambiguity as to whether the jury found the defendants liable on all of the underlying counts.

8. The defendants do rely on *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 808, 514 N.E.2d 116, 120 (1987), in which the court held that there was no private right of action under the Martin Act. Defendants contend that *CPC* indicates that the New York Court of Appeals, if confronted with the question, would not find fraud on the market to be available under common-law, because the court held that there was no private right of action although the "statutory cause of action in state court could add a remedy for defrauded inves-

instead rely on decisions of the Third Circuit, *see, e.g., Peil v. Speiser,* 806 F.2d 1154, 1163 n. 17 (3d Cir.1986), as well as dicta from the Supreme Court suggesting that common-law fraud does not encompass actions based on fraud on the market. *See, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 990 n. 22, 99 L.Ed.2d 194 (1988) (holding that plaintiff could presume reliance and noting Rule 10b–5 actions add to the protection of common law). *See also Herman & MacLean v. Huddleston,* 459 U.S. 375, 388–89, 103 S.Ct. 683, 690–91, 74 L.Ed.2d 548 (1983) (stating in context of holding that clear and convincing evidence required for common law fraud was not applicable to § 10(b) case that "[t]he antifraud provisions of the securities laws are not coextensive with common-law doctrines of fraud.") (footnote omitted).

However, these decisions shed little light on the relevant question, namely whether the New York courts would consider defendants' actions in this case fraud, because they do not address New York law and they contain little persuasive analysis. The cases rely for their holdings on little more than the absence of any state court holdings to the contrary. Moreover, it does not necessarily follow that, because the Supreme Court has stated in dicta that the securities laws add to the protections of common law fraud, fraud of the nature proven at the trial of this case is not actionable at common-law. In the absence of binding authority to the contrary, I am not persuaded, although I recognize that the question is open, that the New York courts would not adapt the doctrine of common-law fraud to encompass the defendants' manipulation of fraud in this case. *Cf. SEC v. Capital Gains Bureau,* 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) (noting that doctrine of fraud was ill-suited to intangibles such as securities and that "the doctrine[ ] must be adapted to the merchandise at issue").

tors in those cases where none exists in common law fraud."

*B. Intent*

The defendants contend that, even if the claim is actionable under the theory of fraud on the market, the finding for the plaintiff on the claim of common-law fraud must be set aside because Minpeco not only failed to prove that the defendants acted with intent to *deceive* silver traders like the plaintiff, but Minpeco's proof was inconsistent with an intent to deceive.

Defendants look for support for this argument to cases arising under the securities laws requiring a plaintiff to establish the "defendant's knowledge of [the] falsity of [its representation of a material fact] and his intention that plaintiff rely on it." *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986). *See also Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3d Cir. 1988). They contend that the evidence in this case does not establish the requisite intent because the testimony of plaintiff's expert that the defendants sought to manipulate the silver market by "scaring the shorts" is inconsistent with the theory that the defendants acted to deceive the market in any fashion.

However, as plaintiff emphasizes, the jury was charged that the plaintiff had to prove, by clear and convincing evidence, among other elements, that the defendants intentionally conspired to manipulate the price of silver and silver futures in 1979–80. This standard of intent is consistent with *Strobl v. New York Mercantile Exch.,*[9] a decision in this court, and the only other case involving a common-law fraud claim premised on fraud on the market of which this court is aware.

Admittedly, an intent to manipulate is not always equivalent to an intent to deceive. However, it is not illogical for *Strobl* and this court to permit a showing of intent in a commodities market that differs from that required in a securities action. Fraud actions arising under the securities laws involve a misrepresentation or omission in a *statement* made to the plain-

9. 582 F.Supp. 770 (S.D.N.Y.1984), 590 F.Supp. 875 (S.D.N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985).

tiff or a segment of the public. Accordingly, a claim for securities fraud requires proof of an intent to deceive, in order to distinguish the defendants' action from an innocent misstatement. In the commodities market, in contrast, the acts that underlie the claim are trades, not statements. What should be and what was established in this case was that the trades of the defendants were not carried out with an innocent intent, but rather with an intent to manipulate. I am not persuaded that more is required.

*C. Reliance*

The defendants also argue that the common-law fraud verdict must be set aside because any presumption that Minpeco relied on the integrity of the market was illogical or effectively rebutted. According to the defendants, because the plaintiff's decision to invest in silver was based on knowledge that the market price was unusually high as a result of speculation, any presumption that Minpeco was induced to invest relying on the integrity of the market was illogical or rebutted. *See Zlotnick v. TIE Communications,* 836 F.2d 818, 822–24 (3d Cir.1988) (declining to presume reliance where plaintiff sold short believing the price overestimated its value).

Despite the defendants' heavy reliance on *Zlotnick,* its relevance to this motion is limited. The question confronted in that case was the propriety of a *presumption* of reliance. The question in this case is the sufficiency of Minpeco's proof that it *relied* on the integrity of the market. The jury was charged that, to find for plaintiff on the claim of common-law fraud, it had to find, among other factors, that the plaintiff had established by clear and convincing evidence that it had "relied on the market's operating free from price manipulation." [10] There was neither a complete absence of evidence supporting the jury's finding that the plaintiff so relied nor was the evidence so overwhelming in favor of the defendants that the jury verdict must be upset. There was, as the defendants emphasize, testimony from plaintiff's witnesses that Minpeco entered the market believing that the price of silver was overvalued because of speculation. TR at 9450–51. However, Fonseca also testified that Minpeco entered the market believing there were "internal authorities in the exchanges who would look after the honesty of the operations that took place on the exchanges" and that he thought Minpeco was "dealing in a honest and trustworthy environment." TR at 9432–33.

Moreover, I am not persuaded that Minpeco's proof of reliance was rebutted in the fashion suggested by *Basic.* The *Basic* court emphasized in the context of a securities fraud case that the defendants could rebut the presumption of reliance by establishing that the plaintiff knew the defendants' statements to be false, *consequently* believed the price to be artificial, and sold shares nevertheless. In such an instance, the plaintiff "could not be said to have relied on the integrity of a price he knew had been manipulated." 108 S.Ct. at 992. Analogizing to the case at hand, the defendants cannot point to any proof that the plaintiff was aware that whatever artificiality existed was caused by the manipulation of the market by the defendants. Moreover, plaintiff's understanding of and reliance on the unusually high price of silver is not to be equated to reliance on a price Minpeco "knew had been manipulated."

4. RICO

Defendants challenge the RICO verdict because it is premised on the invalid common-law fraud claim.[11] Since the motion to

**10.** Contrary to the defendants' suggestion, I believe that the appropriate question is whether the plaintiff thought the price was manipulated. A contrary standard would in essence require the plaintiff to investigate causes of the market's behavior—which I do not believe it is or should be obliged to do—and thus relieve defendants of their responsibility if the plaintiff failed to do so.

**11.** In light of the recent en banc decisions of the Second Circuit—*United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989), and *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989)—the defendants no longer press their argument that the RICO

set aside the verdict on the common-law fraud claim has been denied above, this argument need not be addressed. Moreover, to the extent the defendants' motion poses a challenge to the sufficiency of the proof of fraud and reliance necessary to sustain the RICO verdict, those challenges are virtually indistinguishable from those made with respect to the common-law fraud claim. Accordingly, for the reasons discussed in the context of the common-law fraud claim, these arguments are unpersuasive.

Finally, the defendants contend that Minpeco failed to establish that it was injured "by reason of" the defendants' conduct, because its injury flowed from the defendants' manipulation, rather than from the predicate acts of mail and wire fraud. *See, e.g., Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988) (to establish injury by reason of defendants' conduct, plaintiff must prove that its injury "was caused by the predicate acts of racketeering activity that make up the violation of § 1962"). Defendants' construction of the causation requirement is unacceptably narrow. In the cases upon which defendants rely, the courts found the plaintiff's injury not to have been caused by the predicate acts because the connection between the acts and the injury was only one of "cause-in-fact," *Brandenburg,* 859 F.2d at 1189, or simply "too remote" to support a claim under RICO, *Burdick v. American Express Co.,* 865 F.2d 527, 529 (2d Cir.1989). The same cannot be said of the proof in the case at hand.

In *Brandenburg,* for example, the plaintiffs sought damages to compensate them for being deprived of the use of their savings and the interest on them during the period in which their bank was in conservatorship or receivership, prompted by a run on the bank as a result of rumors that several insured institutions were insolvent. The court affirmed the dismissal of the RICO claim on the ground that plaintiff failed to explain how the defendants' misrepresentations as to the security of deposits at institutions it insured—these misrepresentations constituting the predicate acts—caused the run on the bank or the overextension of its insurance commitments and thus to plead the requisite casual connection between its injury and the predicate acts of racketeering activity. The court concluded that the plaintiffs alleged at most a "cause in fact connection," which was not sufficient to establish RICO liability. *Id.* at 1189. In contrast, in the case at hand, Minpeco has proven more than a cause-in-fact connection between the predicate acts alleged and its injury. Minpeco established that the defendants used the mails and wires to plan and execute the conspiracy to manipulate the market, which caused its injury.[12] Unlike in *Brandenburg,* the acts of the defendants were "so significant and important a cause of [Minpeco's injury] that these defendants should be held responsible for [it]." *Id.* There were not, in the case at hand, intervening, direct causes of the plaintiff's loss. *Id.* at 1190.

Nor was this a case, as was true in *Burdick,* in which plaintiff's injury "is simply too remotely related to the predicate acts of mail and securities fraud to support a claim under RICO." *Burdick,* 865 F.2d at 529. In *Burdick,* the defendant was alleged to have engaged in a pattern of mail and wire fraud through which it failed to credit dividend and interest payments to its customers promptly upon receipt, but instead used the funds for its own benefit for a period of days. Plaintiff maintained that he was injured "by reason of" the defendants' predicate acts, because the fraud interfered with his ability to service his customers and because his refusal to participate in the activities resulted in his

claim cannot be sustained because the enterprise was not continuing.

12. Manipulation of the market need not be a predicate act, as defendants suggest, for this injury to suffice under RICO. For example, *Brandenburg* indicates that the plaintiffs would have alleged sufficient causation between the defendants' misrepresentations and their injury had they established that the misrepresentations caused the run on the bank or the overextension of the insurer's commitments—neither of which were predicate acts. In other words, a RICO plaintiff need only establish that the predicate acts were the proximate cause of the injury.

dismissal. The court rejected both arguments, finding that plaintiff's inability to service his clients was too remote from the predicate acts to support a claim under RICO and that his firing did not violate RICO. *See also Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.) (affirming dismissal of RICO claim where injury was derivative), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Warren v. Manufacturers National Bank of Detroit*, 759 F.2d 542, 544–45 (6th Cir. 1985) (holding that defendant's fraud was directed at company as corporate entity, not toward plaintiff as its employee and thus plaintiff's loss of employment was merely incidental to corporation's injury and not an injury sustained "by reason of" defendant's fraudulent conduct).

In the case at hand, unlike in *Burdick* and *Warren*, the defendants' predicate acts were directed at investors like the plaintiff; Minpeco's injury was not derivative of that suffered directly by another. *See Warren*, 759 F.2d at 545. *Cf. Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir.1988) (emphasizing —in affirming dismissal of plaintiffs' RICO claim because plaintiffs did not establish that injury was caused directly or indirectly by Boesky's insider trading—that plaintiffs were not the target of the racketeering enterprise nor did Boesky "corner the relevant market or control the stocks in question.").

5. Lost Profits

The defendants contend that the evidence does not support the award of $12.15 million in lost profits, because 1) there is no evidence that the price would have declined in an unmanipulated market by December, 1979, when Minpeco closed its positions and 2) there is no evidence supporting Minpeco's theory that "but for the sharp upsurge in prices in the allegedly manipulated silver market in December, 1979, Minpeco would have kept its short contracts open until the price of silver returned to its historic $6 level."

This argument is a repetition of the contention made in defendants' motion for a directed verdict at the close of Minpeco's case. My assessment of the argument is unchanged:

> I understand the defendants to have argued that there is no evidence of record that even in the absence of manipulation silver prices would have been lower in December 1979 through January 1980 when Minpeco closed its short contracts than when in the fall of 1979 Minpeco opened its short contracts. I think the defendants are correct on that point. However, there is sufficient evidence based on Dr. Houthakker's testimony and that of Minpeco officials to allow Minpeco to present a lost profits theory on the grounds that but for the sharp upsurge in prices in the allegedly manipulated silver market in December 1979, Minpeco would have kept its short contracts open until the price of silver returned to its historic $6 level.

TR at 14961–62. Although no fact witness explicitly testified that Minpeco would have kept its positions open until the price fell at least one dollar—the amount it would have had to fall to provide the profit the jury awarded[13]—witnesses for Minpeco testified that it went short thinking it would thereby profit when the price of silver returned to its norm. Drawing the inferences in Minpeco's favor, this testimony, in combination with that of Houthakker that, absent manipulation, political and economic events would have caused the price of silver to rise by one to two dollars, provides sufficient evidence from which a reasonable juror could conclude that Minpeco would have held its positions until the price fell approximately one dollar. Moreover, as was suggested in an earlier damages decision, Minpeco was not required to prove that it would have acted as it did in an unmanipulated market. As I said when denying the defendants' motion to preclude Minpeco from presenting its lost profits claim on the ground that there was no

13. The approximately $12 million award suggests that the jury found that Minpeco had lost profits of one dollar per ounce on the 12 million ounces of short positions it had open as of the end of November, 1979.

evidence that it would have sold short at an unmanipulated price,

> the equitable proposition that a damage award should place the plaintiff in the position he would have been in 'but for' defendants' wrongdoing does not require us literally to travel in time back to fall 1979 and imagine what Minpeco would or would not have done if no manipulation had occurred.

*Minpeco v. ContiCommodity Services*, 676 F.Supp. 486, 495 n. 24 (S.D.N.Y.1987).

6. Interest

Defendants argue that "Minpeco may not as a matter of law recover the cost of borrowed funds under either of its treble-damage claims." [14] The defendants argue, based on case law and legislative history, that the claim for interest is not recoverable under the Clayton Act: The Second Circuit in *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 80 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), rejected an argument by the plaintiff that it was improperly denied "moratory interest" as an element of its antitrust claims. The court stated that:

> [i]t is reasonable to interpret Congress's silence on the matter as indicating that trebled damages are sufficient penalty and that interest need not be included. Moreover, trebled damages will more than adequately compensate TWA for its injuries.

*Id.* (citations omitted). Subsequently, Congress amended section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), to provide in relevant part that

> [t]he court may award under this section ... simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.

The amendment, by its terms as well as its legislative history, authorizes the award only of "simple" interest. According to the defendants, because the RICO statute is modelled after the Clayton Act, interest recovered under RICO similarly is not subject to trebling.

However, because both the case law as well as the text and legislative history of the 1980 Congressional amendment of § 4(a) speak only to the limitations of awards of interest on the judgment in the case, defendants' argument does not apply to the trebling of a jury award of interest paid on borrowed funds. Minpeco's claim for that interest has already been held to be properly treated as a claim for damages, not prejudgment interest. *Minpeco, S.A. v. Hunt*, 686 F.Supp. 420, 425–27 (S.D.N.Y. 1988).

Although the defendants contend that this motion requires the court to consider for the first time whether this item of damages may be trebled, the motion amounts to a reargument of the issues previously decided. The earlier decision indicates clearly that I was aware at the time that prejudgment interest "may not be included for the purposes of trebling damages" and that I regarded the interest paid by Minpeco on the loans it incurred as being an item of damages rather than interest. *Id.* at 426 n. 15. By finding the interest to be an element of damages, I then implicitly held this interest was to be trebled and I so hold explicitly today.

7. Jury Verdict

The defendants contend that the jury verdict reflected confusion rising to the level that necessitates a new trial as to damages because the jury reached a decision as to the amount of interest that was recoverable before deciding what Minpeco's short futures losses were.

> Simply put, it was impossible to decide how much interest expense was incurred

14. Defendants contend that a decision that the interest could not be trebled would effectively eliminate the interest from the judgment, because Minpeco would be required by law to elect between its treble damage recovery under either RICO or the Clayton Act and its single damage claim under the CEA or the common law of New York.

by reason of the manipulation until the jury first decided how much of the loan on which the interest was paid was caused by the defendants' conduct. And it was equally impossible to determine how much of the loan was attributable to the manipulation without first deciding how much of the loss that the loan was designed to fund was caused by the defendants' conduct.[15]

This confusion, according to the defendants, was evident not only in the order in which the jury reached its verdict, but also in the final awards. Whereas the jury awarded Minpeco approximately 63% of the losses on its short futures trading plaintiff claimed it suffered as a result of the conspiracy, its interest award reflected only 50% of the amount claimed. Defendants contend that this result is inconsistent because the award of only 50% interest

> can be rationally justified in only one of two ways: either the jury found (a) that all of the loss (and hence all of the loan) was incurred by reason of the manipulation but that only 50% of the interest was paid on Minpeco's account; or (b) that all of the interest was paid on Minpeco's account but only 50% of the loss was attributable to the defendants' conduct. Neither finding rationally permits the award of 63% of the claimed losses and 50% of the claimed interest, which renders those two verdicts internally inconsistent.[16]

Although the defendants' arguments have a logical appeal the motion for a new trial is denied.[17]

The court is required to reconcile, and thus preserve, whenever possible, jury verdicts, despite a seeming inconsistency.

> [T]he Seventh Amendment imposes upon courts a constitutional obligation to search for an interpretation of the case which reconciles the verdicts and which respects the principle that "juries are not bound by what seems inescapable logic to judges."

*USFL v. NFL*, 644 F.Supp. 1040, 1046 (S.D. N.Y.1986) (citations omitted), *aff'd on other grounds*, 842 F.2d 1335 (2d Cir.1988). Moreover, "to qualify as inconsistent, ... there must be 'no rational, non-speculative way to reconcile ... two essential jury findings.'" *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir.1984) (per curiam) (quoting *Willard v. Hayward*, 577 F.2d 1009, 1011 (5th Cir.1978)). The court must attempt to bring inconsistent verdicts "into harmony," setting them aside "only when cacophony reigns." *Jarvis v. Commercial Union Assurance Cos.*, 823 F.2d 392, 395–96 (10th Cir.1987) (citations omitted). *See also Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir.1985) ("When a special verdict form is used and the jury's findings apparently conflict, the court has a duty to harmonize the answers, if it is possible to do so under a fair reading of them.") (citations omitted); *Bates v. Jean*, 745 F.2d 1146, 1152 (7th Cir.1984) ("Where there is a view

15. Defendants' Memorandum in Support of Defendants' Motion for a New Trial as to Plaintiff's Damages at 8 (November 29, 1988).

16. Reply Memorandum in Support of Defendants' Motion for a New Trial as to Plaintiff's Damages at 5–6 (March 6, 1989).

17. As an initial matter, I note that I do not find persuasive the plaintiff's argument that the defendants waived their right to argue that the verdict is irreconcilably inconsistent by failing to present the argument before the jury was dismissed. Relying on the distinctions between the language of Rule 49(a), addressing special verdicts and interrogatories, and Rule 49(b), which speaks to a general verdict accompanied by interrogatories, those courts that have considered the question have consistently held that a party need not object at the time of the verdict to inconsistencies in special interrogatories to preserve the argument for later review. *See, e.g., Malley–Duff & Assoc. v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 948 n. 1 (5th Cir.1982) (per curiam); *Downs v. Gulf & Western Mfg. Co.*, 677 F.Supp. 661, 668–671 (D.Mass.1987). In contrast, the failure to object at the time of the verdict constitutes a waiver under Rule 49(b). *See, e.g., Jarvis v. Commercial Union Assurance Cos.*, 823 F.2d 392, 396 (10th Cir.1987); *Strauss v. Stratojac Corp.*, 810 F.2d 679, 682–83 (7th Cir.1987); *USFL v. NFL*, 644 F.Supp. 1040, 1048 n. 7 (S.D.N.Y.1986), *aff'd*, 842 F.2d 1335, 1367 (2d Cir.1988). In the case at hand, the jury responded to special interrogatories; therefore, the defendants' argument was not waived.

of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.") (citations omitted).

With one exception, those cases which the defendants cite in support of their argument that the law requires a new trial as to damages in this case involve inconsistencies in the determinations as to liability. *See Jarvis,* 823 F.2d at 395–96 (holding new trial necessary where jury found defendants breached contract, but failed to find defendant liable for breach of contract); *Ladnier,* 769 F.2d at 198–99 (finding irreconcilable inconsistency between finding that defendant didn't act with malice and finding that defendant was liable under § 1983); *Bates,* 745 F.2d at 1152 (jury finding that defendants action was "brutal" irreconcilable with finding that reasonable prison guard would not have known actions were unlawful); *Malley-Duff & Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133, 144–47 (3d Cir.) (finding that defendant conspired to interfere with plaintiff's contract inconsistent with finding that other defendants had not tortiously interfered with plaintiff's contract), *cert. denied,* 469 U.S. 1072 (1984); *Witt,* 725 F.2d at 1280 (finding that shower door was negligently designed was inconsistent with findings that shower door was not defective); *Hopkins v. Coen,* 431 F.2d 1055, 1059 (6th Cir.1970) (new trial necessary where announced verdict was for plaintiff but form verdicts used by jury were irreconcilably inconsistent). In the one exception, *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1106 (5th Cir. 1981), the damage award reflected the inconsistency prompting the new trial. The court of appeals affirmed the decision that a new trial was necessary because the jury awards for plaintiff's damage for breach of contract and for fraud differed substantially, although the plaintiff had claimed the same damages on the same facts on both claims.

In these cases, because the inconsistencies almost always arose in the context of determinations of liability, the courts had little room to maneuver and thus preserve the jury verdict. In the case at hand, however, the alleged inconsistency—both in the process and result of the jury's deliberations—involves more a question of fact and is thus more susceptible to reconciliation.

While it is true, as defendants emphasize, that interest awarded must bear a relationship to the loan principal, it is also true that there is not a one-to-one correlation in this case between the losses Minpeco attributes to the conspiracy and those which it covered with the loan. Minpeco sought to recover short future losses totalling more than 101 million dollars; the interest it sought, however, was the interest it was required to pay on a loan of $80 million that it took out to cover its losses. Moreover, the defendants challenged each element of Minpeco's damage awards in innumerable ways, many of which were unique to particular elements of the damage claims. For example, the defendants put before the jury, through their questioning of Dr. Whalen on cross-examination, an argument that the full amount of interest was not recoverable because Minpeco would not have had to borrow $80 million dollars had the producers paid the $40 million they owed for variation margins. Thus, as Minpeco argues, the jury was not compelled, by the evidence or arguments before it, to return verdicts on the claims for short futures losses and interest in identical proportions.

In sum, the jury's determination of the interest award before the short futures losses award is not so inconsistent or irrational as to compel a new trial as to damages. It may be, as the plaintiff argues, that the jury had reached some decisions concerning the amount of short futures losses caused by the conspiracy before it addressed the question of interest: the jury may have concluded that it would award Minpeco at least 50% of the amount sought for short futures losses and that, even if it were to award a greater percentage of losses, other factors would justify a lesser interest award. As the *USFL* court stated when rejecting the plaintiff's claim that the jury's finding that the defendants were not liable on the claim of conspiracy to monopolize was inconsistent with the finding that there was a conspiracy to acquire or main-

tain monopoly power in all or portions of the business of professional football, "since a plausible explanation exists for the purported inconsistency in the jury's verdicts, the trial court's obligation is to accept that explanation rather than leap to the conclusion that the jury was hopelessly confused." 644 F.Supp. at 1047.

8. Peru's Loan Assumption

Finally, the defendants contend that the judgment in the plaintiff's favor must be reduced by $45.68 million[18]—the amount of its loan that was assumed by the State of Peru in 1983. Defendants maintain that, without this reduction, Minpeco's recovery will not be limited to its "net economic injury," as required by this court's earlier decision holding that Minpeco's gain on the rise of the price of silver must be offset against whatever losses it incurred on its short contracts. *Minpeco v. Conticommodity Services, Inc.*, 676 F.Supp. 486, 490 (S.D.N.Y.1987) ("*Minpeco*"). The defendants contend further that even the collateral source rule does not protect the verdict from this reduction because Peru's payment falls within New York's exception for gratuitous compensation. I am not persuaded by either of these arguments. The nature of Peru's "payment" to Minpeco differs significantly from those benefits addressed and contemplated in *Minpeco* and from those payments found to be gratuitous under New York state law.

*Minpeco* spoke of "net economic injury." However, *Minpeco* and the cases upon which it relied addressed the need to offset plaintiff's claimed damages by the benefits received as a direct result of the "*defendants'* allegedly manipulative behavior." *Minpeco*, 676 F.Supp. at 490 (emphasis added). Thus, in *Minpeco*, the question was whether the plaintiff's claimed losses incurred in the trades on the silver futures market had to be offset by the rise in value of Minpeco's physical silver—the gains resulting from every price rise that caused the losses. The offset so construed—limited to the benefits directly resulting from the defendants' illegal conduct—thus holds the defendants responsible for the consequences of their behavior, whether harmful or beneficial.

The "benefit" from Peru at issue is markedly different in nature. In the case of Peru's contribution to Minpeco's capital—in an exchange of Minpeco stock to Peru in return for its assumption of the loan[19]—the benefit to Minpeco derived from another party. The connection to the conspiracy is much more attenuated: the conspiracy caused Minpeco losses which caused it to obtain loans, part of which were assumed three years after the period of conspiracy by another source.

The difference in the nature of the "benefit" compels a result different from that of *Minpeco*. Reduction of the damages to reflect Peru's assumption of the loan would fail to hold the defendants responsible for the losses they caused Minpeco and permit them to escape liability for their acts because others chose to or had to aid the injured party. *Cf. Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir.1985) (county could recover under RICO for fraudulent underpayment of taxes although it may have recovered losses through increase in taxes); *United States v. Lynch*, 699 F.2d 839, 845 (7th Cir.1982) (affirming award of restitution, ordered for defendant convicted for mail fraud and under RICO, despite argument that victim of scheme had recouped losses in increased taxes; "there is no basis in the statute or case law for concluding that the victim of a fraud is not an aggrieved party simply because he obtains compensation for his loss from another party"). Such a result would frustrate the deterrent goal to be served by RICO and the antitrust statutes, evidenced by their treble damage provisions.[20] Finally, Peru's as-

**18.** The defendants argue that the sum must be reduced before trebling.

**19.** The State of Peru was Minpeco's sole shareholder and thus owned 100% of the stock before and after the contribution.

**20.** It is true that the court in *Los Angeles Memorial Coliseum Com'n v. NFL,* 791 F.2d 1356, 1374 (1986), upon which my earlier decision relied, rejected the argument that the offset at issue was inconsistent with the purposes to be served by the antitrust laws. However, in that case, as

sumption of the loan did not produce a "windfall" to Minpeco, as that term is traditionally understood. The State of Peru assumed the loan in 1983 as a capital contribution to Minpeco. Minpeco was limited in and accountable for its use of the sum, because it was made as a capital contribution.

In short, plaintiff has made a showing in this instance that the suggested offset would "be unequitable or contrary to deterrent goals." *Minpeco,* 676 F.Supp. at 490. *Cf. EEOC v. Enterprise Ass'n Steamfitters,* 542 F.2d 579 (2d Cir.1976) (holding that district court did not abuse discretion by deducting from judgment sums received for unemployment compensation in Title VII case, where there was no compelling reason of deterrence or retribution for failing to offset the damages), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).

Moreover, the question presented by this motion, like that in the earlier offset decision, can be resolved by looking to the analysis of damages in cases arising under federal law alone. No persuasive reason has been advanced for the application of New York law to the federal claims in the circumstances. However, even if the collateral source doctrine and New York's "gratuity" exception applied, Peru's contribution would not fall within the exception.

The gratuity exception provides for reduction of the judgment for "wholly gratuitous services and payments received by an injured plaintiff for which he gave no consideration and which he is not obligated to repay, absolutely or contingently." *Rutzen v. Monroe County Long Term Care Program,* 104 Misc.2d 1000, 429 N.Y.S.2d 863, 864 (Sup.Ct.1980). The New York state courts have held that wages received by an employee from its employer during a period of disability, *Lomonte v. A & P Food Stores,* 107 Misc.2d 88, 438 N.Y.S.2d 54, 57 (1st Dept.1981), *Drinkwater v. Dinsmore,* 80 N.Y. 390 (1880), and medical services provided as a professional obligation, *Coyne v. Campbell,* 11 N.Y.2d 372, 230 N.Y.S.2d 1, 3, 183 N.E.2d 891, 893 (1962), constitute gratuitous payments. The New York courts have, however, rejected arguments that unemployment insurance payments and other fringe benefits, *Rutzen,* 429 N.Y.S.2d at 865, as well as insurance proceeds, *Anastasia v. Barnes,* 127 Misc.2d 971, 487 N.Y.S.2d 628, 631 (Sup.Ct. 1985), fall within this exception because they constitute compensation for employment services already performed. The exception has also been held not to encompass payments that impose upon the recipient a future obligation. *Ideal Mut. Ins. Co. v. Korean Reinsurance Corp.,* 657 F.Supp. 1174, 1176 (S.D.N.Y.1987) (payments from plaintiff's reinsurance broker were not gratuitous: "there was no evidence that the relationship between [the plaintiff] and its brokers was anything but strictly commercial" and the evidence indicated that payments were more of the nature of advances rather than gifts).

Although different in nature from the payments addressed in the cases cited above, Peru's assumption of the loan is more analogous to the insurance payments "effected by [the plaintiff] and to the procurement of which the wrongdoer did not contribute", *Rutzen,* 429 N.Y.S.2d at 864, than to those payments motivated by "mere benevolence", *Drinkwater,* 80 N.Y. at 393.

* * *

In sum, for the reasons stated above, defendants' motions are denied. With respect to defendants' arguments challenging the sufficiency of the evidence, it simply cannot be said that there was a "complete lack of evidence" supporting the jury verdict such that the finding had to have been the result of "sheer surmise" or that a reasonable juror could not arrive at a verdict adverse to the defendants because the evidence was so overwhelming in their favor. *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 598 (2d Cir.1989). Nor was the verdict "against the weight of the evi-

in my earlier decision, the offset involved benefits that accrued to the plaintiff as a direct result of the defendants' illegal conduct.

dence" and thus a new trial warranted. *Id.* at 599. Finally, those arguments challenging the legal standards applied during the trial and reflected in the judgment are not persuasive.

It is so ordered.